DANIELLA GUTIERREZ & another[1] *vs.* MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY & others.[2]

Suffolk. April 2, 2002. - August 2, 2002.

Present (Sitting at Barnstable): MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, &
CORDY, JJ.

*Massachusetts Bay Transportation Authority,* Police officers. *Arrest. Massachusetts Civil Rights Act. Civil Rights,* Availability of remedy, Immunity of public official. *Malicious Prosecution. Abuse of Process. Probable Cause. Emotional Distress. Negligence,* Emotional distress. *Practice, Civil,* Admissions, Challenge of jurors. *Conspiracy.*

In the trial of a civil complaint alleging that a police officer's use of excessive force violated the plaintiff's civil rights under 42 U.S.C. § 1983, the judge erred in directing a verdict on the excessive force claim based on the jury's verdict on a negligence claim, where, although the jury found the officer negligent, the factual basis for the jury's verdict was unknown. [400-403]

This court concluded that in the retrial of a civil action alleging personal injuries and civil rights violations, the qualified immunity defense would not be available to the defendant law enforcement officials, where the defendants failed to argue in the first trial that the officers' use of force was objectively reasonable or that the law was not clearly established so as to inform a reasonable officer that his use of excessive force was unreasonable. [403-405]

In a civil action arising out of the arrest of the plaintiffs by the defendant law enforcement officials, the judge properly structured the jury verdict slip to preclude consideration of the plaintiffs' malicious prosecution claims if the jury found probable cause to arrest [405-407]; however, the judge erred in similarly structuring the jury verdict slip to preclude consideration of the plaintiffs' abuse of process claims if the jury found probable cause to arrest, because probable cause at the time of the arrest did not necessarily equate with subjective good faith in filling out an arrest report at a later time [407-409].

In a civil action arising out of the warrantless arrest of the plaintiffs by the defendant law enforcement officials, the judge erred in instructing the jury that in order to prove a false arrest claim, the plaintiffs had to prove by a reasonable preponderance of the evidence that they had been arrested without probable cause, because the defendants bore the burden of proving that justification for the arrests existed. [409]

In an action alleging civil rights violations arising out of the arrest of the

[1]Dominique Gutierrez.

[2]Franklin Wolverton, Giancarlo Cantella, Omar Ricketts, and Royline Lamb.

plaintiffs by the defendant law enforcement officials, the judge properly declined to instruct the jury that an officer would be liable for a civil rights violation if he arrested someone to prevent the exercise of that person's right to speech under the First Amendment to the United States Constitution, where, under the circumstances of the case, a civil rights violation based on the First Amendment would have been redundant of the plaintiffs' Fourth Amendment claim that the officers arrested them without probable cause, on which the judge did instruct the jury. [409-410]

The judge in an action alleging civil rights violations properly declined to instruct the jury that the right to be in a place of public accommodation was a civil right, where the judge's instruction alerted the jury to the fact that the defendant police officers had the right to order the plaintiffs to leave a place of public accommodation only for good cause, but left the jury to decide whether to believe the officers' assertion that their fear of a melee in a train station was the motivation behind their order to leave. [410-411]

The judge in a civil action alleging negligent infliction of emotional distress properly instructed the jury that negligent injury could not be only emotional injury without physical injury, where the plaintiff had not alleged any objective manifestation of her distress. [411-413]

In a civil action, the judge incorrectly concluded that a denial of a request for admission was admissible as a prior inconsistent statement, but the error was harmless, as the plaintiffs declined to introduce the denial. [413-414]

In a civil action, the judge did not err in handling the plaintiffs' objection to the defense counsel's use of peremptory challenges to strike African-Americans from the jury, where the judge asked counsel to explain his challenges to three African-American jurors, and then, after receiving an explanation from counsel that he had challenged them because they had expressed an unwillingness to serve on a jury, reviewed each of the challenged jurors and determined that each had expressed such reservations. [414-415]

The judge in a civil action properly declined to instruct the jury on a claim of civil conspiracy to deprive the plaintiffs of their civil rights, where there was no evidence that the defendants had agreed together to violate the plaintiffs' civil rights. [415-416]

CIVIL ACTION commenced in the Superior Court Department on November 10, 1995.

The case was tried before *Mitchell J. Sikora*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michael J. Heineman* (*David W. Heinlein* with him) for the plaintiffs.

*James G. Reardon, Jr.* (*Julie E. Reardon* with him) for the defendants.

*Austin M. Joyce*, for Massachusetts Police Association, Inc., amicus curiae, submitted a brief.

COWIN, J. The plaintiffs, sisters Daniella and Dominique Gutierrez, brought this action against the Massachusetts Bay Transportation Authority (MBTA), four of its officers individually, and two other individuals[3] for personal injuries and civil rights violations. Their claims arose out of an incident at the New England Medical Center MBTA station in Boston during which MBTA officers placed the plaintiffs under arrest for trespassing. Daniella was also charged with being a disorderly person. The plaintiffs' complaint asserted claims against each individual officer for assault and battery, false arrest and imprisonment, malicious prosecution, abuse of process, intentional infliction of emotional distress, civil rights violations, negligence, and conspiracy to violate civil rights. There were also claims of strict liability against the MBTA.

A Superior Court jury found that Officer Giancarlo Cantella of the MBTA police negligently injured Daniella Gutierrez and awarded her damages in the amount of $53,000. The jury found for the defendants on all of the plaintiffs' remaining claims that were submitted to them (certain claims not relevant to the issues before us were not submitted to the jury). Following the verdict, the judge, sua sponte, issued a posttrial ruling on Daniella Gutierrez's civil rights claim. He concluded that he had instructed the jury incorrectly on this claim, and that the jury would have found in her favor had he given the correct instructions. As a result, the judge entered a supplemental judgment awarding Daniella the attorney's fees and costs associated with her civil rights claim. The plaintiffs, the MBTA, and Cantella all appealed from the judgment, and we transferred the case here. We vacate portions of the judgment, affirm others, and remand the case for further proceedings.

1. *Factual background.* We summarize briefly the evidence at trial. On the day of the incident in question, Officer Frank Wolverton of the MBTA police was on patrol at the New England Medical Center MBTA station. Near the station entrance, he observed two young African-American males dribbling a basketball. He approached the youths, requesting that

---

[3] An official and an attorney with the Massachusetts Bay Transportation Authority. The plaintiffs stipulated to the dismissal of the claims against these individuals.

they "knock off the basketball playing." They ignored the officer's request, and one of the youths, Marcus Barrow, began jumping up and jamming the ball into the girders above the station entrance. Officer Wolverton once again asked Barrow to stop, but he continued. Barrow cursed at the officer, who then reached for the ball. Barrow pushed Officer Wolverton away, striking him in the shoulder or chest area. At this point, Officer Wolverton attempted to make an arrest, and when Barrow resisted, Officer Wolverton subdued him with "pepper mace" spray.

A crowd of angry high school students, including Dominique and Daniella Gutierrez, gathered at the scene to protest Officer Wolverton's treatment of Barrow. A number of the students requested Officer Wolverton's badge number. Apprehensive that the situation was quickly growing out of control, Officer Wolverton radioed for assistance. Officers Moy, Lamb, Cantella, Vecchi, and Ricketts of the MBTA police responded to Officer Wolverton's call and directed the crowd to disperse. Daniella threw a bag of corn chips at Officer Wolverton as he escorted Barrow from the station, and then attempted to grab Officer Vecchi to prevent him from making an arrest.

Officer Ricketts approached Daniella, informed her that she was under arrest, and attempted to place handcuffs on her. When she began struggling to avoid arrest, Officer Ricketts took hold of her left arm and brought her to the ground. Officer Cantella approached to assist Officer Ricketts. Officer Cantella testified that Daniella continued to move while he attempted to bring her right arm around, causing him to fall forward while holding her right arm. He heard a popping sound as Daniella yelled out in pain. He released her arm and radioed for an ambulance. She was later diagnosed as suffering a fracture of her right arm. According to Daniella, the injury occurred when Officer Cantella forcefully twisted her right arm behind her back.

During this time, Dominique was grabbed by Officer Lamb, pushed to the floor, handcuffed, and taken to the police station. Dominique testified that she was attempting to leave the station as she was arrested. She stated that she repeatedly requested Officer Wolverton's badge number, but that the officers refused to provide her with this information. Dominique was charged with

trespassing, and Daniella was charged with trespassing and disorderly conduct. Both were acquitted of all charges after a trial.

2. *Daniella's excessive force claim.* After the jury returned their verdict, the judge, sua sponte, issued a posttrial ruling amending the verdict with respect to Daniella's civil rights claim, brought under the Federal Civil Rights Act, 42 U.S.C. § 1983 (1994 & Supp. II 1996), and the Massachusetts Civil Rights Act, G. L. c. 12, § 11I.[4] This claim was grounded, in part, on the theory that Officer Cantella violated Daniella's rights under the Fourth Amendment to the United States Constitution by using excessive force during her arrest. In his posttrial ruling, the judge concluded that he had erroneously instructed the jury on excessive force. The erroneous instruction was in response to a jury question: "Can excessive force be unintentional?" The judge answered:

> "[E]xcessive force must be intentional or it must be reckless. If the use of excessive force is merely negligent or careless by reason of bad judgment or by reason of execution or behavior, if it is merely negligent or careless, it is not actionable and it is not liable as a matter of civil rights violation . . . ."

The judge later concluded that this instruction was improper under *Graham* v. *Connor*, 490 U.S. 386 (1989), which he interpreted as permitting an excessive force claim based on merely negligent or unreasonable conduct. He reasoned further that, correctly instructed, the jury, having found negligence by Officer Cantella, would have found in favor of Daniella on her civil rights claim.[5]

The judge was correct that his initial instruction was

---

[4]Although the language of the plaintiffs' complaint invoked only the Massachusetts civil rights statute, the judge interpreted the complaint as bringing claims under both 42 U.S.C. § 1983 (1994 & Supp. II 1996) and G. L. c. 12, § 11I, because "Massachusetts decisions have termed them 'coextensive' when explicitly pleaded; and because plaintiffs' counsel viewed § 1983 claims as asserted, and requested instructions under § 1983." The defendants did not object.

[5]The judge reversed the verdict on Daniella's excessive force claim only; he did not address Dominique's excessive force claim. The plaintiffs have

erroneous. To prove a violation of § 1983,[6] a plaintiff must demonstrate that the defendant deprived her of a Federal constitutional or statutory right while acting under color of State law. *Grant* v. *John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 355 (D. Mass. 2002), quoting *Martinez* v. *Colon*, 54 F.3d 980, 984 (1st Cir. 1995). In an excessive force claim, once the specific constitutional right allegedly infringed by the use of force has been identified, the validity of the claim is "judged by reference to the specific constitutional standard which governs that right rather than to some generalized 'excessive force' standard." *Graham* v. *Connor*, *supra* at 394.

The Fourth Amendment provides the appropriate constitutional standard when the claim arises out of excessive force used during an arrest. *Id.* That amendment guarantees the right to be " 'secure . . . against unreasonable . . . seizures' of the person." *Id.* Fourth Amendment liability is possible only when a "seizure" has occurred. See *Troublefield* v. *Harrisburg Bur. of Police*, 789 F. Supp. 160, 165 (M.D. Pa.), aff'd, 980 F.2d 724 (3d Cir. 1992). A "seizure" is defined in this context as "an intentional acquisition of physical control" and "occurs only when there is a governmental termination of freedom of movement *through means intentionally applied*" (emphasis original). *Brower* v. *County of Inyo*, 489 U.S. 593, 596, 597 (1989). An accidental use of force, even if occurring during the course of an arrest or other physical restraint of a person, does not constitute a seizure because it is not a "means intentionally applied" to obtain control of the arrestee. *Glasco* v. *Ballard*, 768 F. Supp. 176, 179 (E.D. Va. 1991); *Troublefield* v. *Harrisburg Bur. of Police*, *supra* at 165. The Fourth Amendment protects against " 'misuse of power,' . . . not the accidental effects of otherwise lawful government conduct." *Brower* v. *County of*

---

raised no issue as to the effect of the erroneous instruction on Dominique's excessive force claim.

[6]"Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

*Inyo, supra* at 596, quoting *Byars* v. *United States,* 273 U.S. 28, 33 (1927). Thus, for a seizure to occur, the defendant must use an instrumentality or set in motion events that he intends to result in the seizure of the plaintiff; it is immaterial whether the police officer had a subjective intent to harm the plaintiff. *Graham* v. *Connor, supra* at 397. See *Troublefield* v. *Harrisburg Bur. of Police, supra* at 164 ("whether a law enforcement officer voluntarily chose the course of action which harmed a suspect is relevant; whether he acted intending to harm the suspect . . . is not").

In this case, Officer Cantella took Daniella into his control through a "means intentionally applied" — he grabbed her arm. If he broke her arm by the act of grabbing it and pulling it behind her back (her version of events), then a reasonableness inquiry under the Fourth Amendment is warranted: the force that seized her is the force that injured her, and it would be for Daniella to demonstrate that a reasonable officer would not have used that degree of force. If, however, she was injured when Officer Cantella accidentally fell on her as she struggled to avoid arrest (his version), no Fourth Amendment rights have been trampled, because the officer did not intend to bring her under his control by falling on her; falling on her was not the means that Officer Cantella used to seize her.

The jury found Officer Cantella negligent, but we do not know the factual basis of that verdict. The jury could have found some form of negligence on either party's version of events, and we do not know precisely what aspect of Officer Cantella's conduct they found to be negligent. The judge, accordingly, could not properly direct a verdict on the excessive force claim based on the jury's verdict on the negligence claim. We remand the case to the Superior Court for a new trial on Daniella's claim that use of excessive force violated her civil rights under 42 U.S.C. § 1983.[7] As discussed below, errors at trial necessitate the retrial of additional portions of the plaintiffs'

---

[7] In his posttrial ruling, the judge wrote that, in giving his instruction at trial, he had interpreted the requirement of "threats, intimidation, or coercion" in G. L. c. 12, § 11I, as requiring a "bad or guilty state of mind in the zone extending from intentional to reckless." Although he comments that Massachusetts appellate courts have not yet addressed the issue, his ruling appears only to apply to his instruction on § 1983 and does not seem to alter the outcome

other claims. We also discuss other issues that may arise during any retrial.

3. *Qualified immunity.* The defendants claim that they are entitled to qualified immunity on all claims against them as a matter of law.[8] Qualified immunity "shields law enforcement officials who reasonably but mistakenly believe that they are acting in accordance with constitutional mandates." *Medeiros* v. *Dracut*, 21 F. Supp. 2d 82, 85 (D. Mass. 1998). See *Duarte* v. *Healy*, 405 Mass. 43, 47 (1989) (qualified immunity principles as developed under Federal law also shield public officials from liability under Massachusetts Civil Rights Act).

In a recent decision, the United States Supreme Court set forth certain principles governing qualified immunity in the context of an excessive force claim. *Saucier* v. *Katz*, 533 U.S. 194, 200-201 (2001). The Court emphasized the importance of deciding the qualified immunity defense "at the earliest possible stage in [the] litigation." *Id.* at 201, quoting *Hunter* v. *Bryant*, 502 U.S. 224, 227 (1991) (per curiam), because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," *Saucier* v. *Katz, supra* at 200, quoting *Mitchell* v. *Forsyth*, 472 U.S. 511, 526 (1985), and the benefit is "effectively lost if a case is erroneously permitted to go to trial." *Saucier* v. *Katz, supra* at 201. See *Kent* v. *Commonwealth, ante* 312, 316-317 (2002). Because the benefit of qualified immunity is essentially lost if not allowed prior to trial, defendants may pursue interlocutory appeals. See *Fabre* v. *Walton*, 436 Mass. 517, 521 (2002). See also *Brum* v. *Dartmouth*, 428 Mass. 684, 688 (1999) ("The right to immunity from suit would be 'lost forever' if an order denying it were not appealable until the close of litigation . . .").

The *Saucier* case laid out a two-part inquiry to be applied in evaluating a claim of qualified immunity. *Saucier* v. *Katz, supra* at 200-201. A judge must first decide whether, "[t]aken in the

---

of the § 11I claim. Thus, we do not decide whether the Massachusetts Civil Rights Act requires some showing of a guilty state of mind for an excessive force violation. The plaintiffs have not challenged his instructions relating to the Massachusetts Civil Rights Act Claim.

[8]Although the defendants claim qualified immunity as to all claims, the only remaining claim to which qualified immunity may apply is Daniella's excessive force claim.

light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier* v. *Katz, supra* at 201. If so, the judge then must ask whether the right was clearly established so that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.[9]

If it is evident from the allegations of the complaint alone that the defendant is entitled to qualified immunity, the matter may be decided by means of a motion to dismiss. *Johnson* v. *Breeden,* 280 F.3d 1308, 1317 (11th Cir. 2002). Ordinarily, the earliest stage of litigation at which qualified immunity will be decided will be summary judgment. *Id.* Here, the defendants raised the issue of qualified immunity in a motion in limine. However, their argument concerning qualified immunity was based on a request that the judge rule, as a matter of law, that the officers' arrest of the plaintiffs was supported by probable cause. The judge did not explicitly rule on the defendants' motion in limine, but his failure to rule on it prior to trial was effectively a denial of the motion. Even if the judge had allowed the motion in limine, the defendants would not have been entitled to qualified immunity on the excessive force claim; the relevant question is not whether the arrest was supported by probable cause, but whether the officers' use of force in carrying out the arrest was objectively reasonable. *Graham* v. *Connor,* 490 U.S. 386, 396-397 (1989). The defendants raised the issue once again in their motion for directed verdict, arguing that the officers acted with probable cause to arrest; again they failed to address whether the force used in effecting the arrest was reasonable. Both motions were properly denied, as the defendants failed to argue that the officers' use of force was

---

[9]Because determining the applicability of the qualified immunity defense and determining the merits of an excessive force claim both involve an inquiry into the objective reasonableness of an officer's conduct, some courts had concluded that the two inquiries were identical. See, e.g., *Katz* v. *United States,* 194 F.3d 962, 968 (9th Cir. 1999), rev'd, *Saucier* v. *Katz,* 533 U.S. 194 (2001). Under this rationale, there could be no qualified immunity defense if the officer were determined to have used excessive force. However, in *Saucier* v. *Katz,* 533 U.S. 194, 204 (2001), the Supreme Court rejected the idea that the inquiries for qualified immunity and excessive force are identical. While the considerations in resolving the questions are the same, they are explored at different times for different purposes.

objectively reasonable or that the law was not clearly established so as to inform a reasonable officer that his use of excessive force was unreasonable. The qualified immunity defense will therefore be unavailable at any retrial.

4. *Malicious prosecution and abuse of process.* The plaintiffs assert that the verdict slip was erroneously structured so as to preclude the jury's consideration of the malicious prosecution and abuse of process claims if they found that the officers had probable cause to arrest the plaintiffs. The jury rendered their verdict on separate forms for Daniella and Dominique. The first question on both forms asked the jurors whether the MBTA police had probable cause to arrest. The slips directed the jurors to "bypass" the jury questions regarding malicious prosecution and abuse of process if they responded "yes" to the first question. The jury answered "yes" to the question on both slips, thereby eliminating the need to consider the malicious prosecution and abuse of process claims. The plaintiffs argue that, while a finding of probable cause to arrest precludes liability for false arrest, it does not automatically equate with a failure to prove the necessary elements of malicious prosecution and abuse of process.

To make out a claim for malicious prosecution, a plaintiff must prove: "(1) the institution of criminal process against the plaintiff with malice; and (2) without probable cause; and (3) the termination of the criminal proceeding in favor of the plaintiff." J.R. Nolan & L.J. Sartorio, Tort Law § 77, at 88 (2d ed. 1989). See *Beecy* v. *Pucciarelli*, 387 Mass. 589, 593 (1982).[10] The plaintiffs argue that probable cause to arrest is not conclusive where, as here, the plaintiffs allege that the officers initiated the prosecution based on an event occurring after the arrest, i.e., the submission of inaccurate arrest reports.

Generally, where there is probable cause to arrest, the plaintiff has failed to meet the probable cause element of malicious prosecution. See *Bryant* v. *Noether*, 163 F. Supp. 2d 98, 111 (D.

---

[10]In the civil context, probable cause is a matter for the jury if the facts are disputed. *New Bedford Hous. Auth.* v. *Olan*, 50 Mass. App. Ct. 188, 203 n.26 (2000), *S.C.*, 435 Mass. 365 (2001). See *Lewis* v. *Kendrick*, 944 F.2d 949, 952 (1st Cir. 1991) (probable cause matter for jury in claim under 42 U.S.C. §§ 1983, 1985).

N.H. 2001) ("a common law malicious prosecution claim would also fail since the court has found that probable cause to arrest plaintiff did exist"); *Hotaling* v. *LaPlante,* 167 F. Supp. 2d 517, 523 (N.D.N.Y. 2001) ("As with a claim for false arrest, the existence of probable cause is an absolute defense to a cause of action for malicious prosecution"). *Vince* v. *Posadas de P.R., S.A.,* 683 F. Supp. 312, 316 (D.P.R. 1988) ("Where . . . there is sufficient evidence to establish the existence of probable cause to arrest, plaintiffs' action for malicious prosecution is effectively barred"). While it seems logical that a finding of probable cause to arrest the plaintiff precludes a malicious prosecution claim where the officer's only involvement in the prosecution is the plaintiff's arrest, the relevant determination in a malicious prosecution claim is whether there was probable cause to "believe the criminal proceeding could succeed and, hence, should be commenced." *Mejia* v. *City of N.Y.,* 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000). Therefore, probable cause to arrest may not be conclusive where evidence later surfaces that eliminates probable cause, and the police are involved in pursuing the action despite the discovery of this evidence. See *Lowth* v. *Cheektowaga,* 82 F.3d 563, 571 (2d Cir. 1996); *Mejia* v. *City of N.Y., supra* at 254 ("information discovered by a malicious prosecution defendant after the arrest, but before the commencement of proceedings, is relevant to the determination of probable cause in cases where the prosecution follows a warrantless arrest").

The defendant officers in this case did not personally file the complaints against the plaintiffs; another MBTA officer who was not present at the events did so based on the defendants' arrest reports.[11] The plaintiffs allege that the officers' reports contained errors, and in turn these arrest reports were relied on by the prosecutor in deciding to bring charges. During the course of the trial, more than one officer admitted that his arrest report contained errors. Officer Ricketts's report states that Daniella Gutierrez attempted to help Officer Wolverton's prisoner escape and that he pulled Daniella from Officer Wolverton. During his

---

[11]Some of the defendants' arrest reports were "signed under the penalties of perjury," and thus also served as affidavits. However, some of the arrest reports were not signed in this manner by the arresting officer.

testimony in this case, Officer Ricketts admitted that the officer described in the report was in fact Officer Vecchi, and that he did not pull Daniella from the officer, but instead was "trying to restrain her from getting at a police officer." Officer Wolverton agreed that his report contained "a lot of mistakes," such as indicating that the events occurred at 2:25 P.M. when they in fact occurred at approximately 4:15 P.M. The plaintiffs also presented evidence that portions of Officer Wolverton's arrest report regarding Dominique were identical to the report of Officer Betts concerning his arrest of another student. At trial, Officer Wolverton denied conferring with Officer Betts in preparation for writing his report. Further, each officer testified that he was aware that his affidavit would be submitted to a prosecutor and used to bring charges against the plaintiffs.

Although these discrepancies may be relevant to the officers' motives in pursuing charges against the plaintiffs, they do not negate (or even detract from) the existence of probable cause. The officers asserted at trial that their determination of probable cause was dependent on the facts as they witnessed them, and not on the erroneous material in their arrest reports. The jury were warranted in finding probable cause to arrest based on the events as described at trial, and the subsequent errors in the police reports do not negate or detract from the probable cause that existed at the time of arrest. The mistakes in the arrest reports were not so severe that they created probable cause to prosecute where there otherwise was none. Therefore, on the evidence presented, the judge did not err by structuring the verdict slip to preclude consideration of the malicious prosecution claims should the jury find probable cause to arrest.

We reach an opposite conclusion as to the plaintiffs' abuse of process claim. "The tort of malicious abuse of process consists in [*sic*] the use of lawful process primarily for a purpose for which it is not designed." J.R. Nolan & L.J. Sartorio, Tort Law § 82, at 108 (2d ed. 1989). The elements of an abuse of process claim are that: "(1) 'process' was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage." *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 775-776 (1986), quoting *Jones* v. *Brockton Pub. Mkts., Inc.*, 369 Mass. 387, 389 (1975). The plaintiffs are correct that probable cause is

irrelevant to an abuse of process claim. "[I]t is immaterial that the process was properly issued, that it was obtained in the course of proceedings which were brought with probable cause and for a proper purpose or even that the proceedings terminated in favor of the person instituting or initiating them." *Quaranto* v. *Silverman*, 345 Mass. 423, 426 (1963), quoting Restatement of Torts § 682 comment a. See Restatement (Second) of Torts § 682 comment a (1977).

The judge here, however, determined that probable cause to arrest and improper purpose were inconsistent, stating that "in order to find there was probable cause, the jury is going to have to find that the officers acted in good faith, that is, with an honest subjective belief of the existence of grounds to arrest." But there was enough evidence for the jury to conclude that the defendant officers sought to initiate proceedings against the plaintiffs for an improper purpose. The plaintiffs allege that the defendants included false facts in their arrest reports, and that the inclusion of these facts encouraged the prosecution to bring process against the defendants. The jury could infer that the officers' reports intentionally exaggerated the gravity of the situation so that the prosecutor would be more likely to press charges. Probable cause at the time of the arrest does not equate necessarily with subjective good faith in filling out an arrest report at a later time. By the time the arrest reports were being prepared, the officers were aware of the extent of Daniella's injuries, and the desire to see the plaintiffs prosecuted could be interpreted as a preemptive maneuver in anticipation of tort and civil rights claims. Good faith belief at the scene as to the sisters' involvement may have been eclipsed by other considerations that emerged after the arrests were effected. Thus, a finding by the jury of probable cause to arrest should not preclude consideration of an abuse of process claim.

The defendants maintain that process refers to "the papers issued by a court to bring a party or property within its jurisdiction," *Jones* v. *Brockton Pub. Mkts., Inc., supra* at 390, and that there is no evidence that the individual defendants were actually involved in an activity which would fall within the definition of "process." The plaintiffs presented evidence that the officers falsified arrest reports that served as the basis for sworn ap-

plications for complaints. Thus, there was evidence from which a jury could conclude that the officers caused papers to issue by a court to bring a party within its jurisdiction. We therefore reverse and remand for a new trial on plaintiff's claim for abuse of process.

5. *The burden of demonstrating probable cause.* The plaintiffs argue that the jury should have been instructed that, in the case of a warrantless arrest, the burden of proof shifts to the defendants to justify the arrest. In a false arrest claim, where an arrest is effected without a warrant, it is indeed the defendants' burden to prove a justification.[12] See *Shine* v. *Vega*, 429 Mass. 456, 463 n.13 (1999) (judge correctly instructed that on claim of false imprisonment, defendants had "the burden of proof establishing that [the defendants] confined [the plaintiff] because their confinement was justified by law"); *Julian* v. *Randazzo*, 380 Mass. 391, 395 (1980) (burden on defendants to prove justification for arresting plaintiffs without warrant); *Muniz* v. *Mehlman*, 327 Mass. 353, 356 (1951) ("In an action for an illegal arrest or imprisonment the burden is on the defendant to prove justification"); *Jackson* v. *Knowlton*, 173 Mass. 94, 95 (1899). The judge erroneously instructed the jury that "[i]n order to prove a false arrest [claim] the plaintiffs must satisfy you by a reasonable preponderance of the evidence that they were arrested without probable cause." Therefore, we must vacate the judgment on both plaintiffs' false arrest claims and remand for a new trial.

6. *The plaintiffs' First Amendment claims.* The judge instructed the jury that they could find a civil rights violation if they found that the officers arrested the plaintiffs without probable cause, or if the officers used excessive force in carrying out the arrest, even if they had probable cause. The plaintiffs requested an additional instruction that an officer is liable for a

---

[12]Although the plaintiffs did not expressly limit their argument on the burden of proof to the false arrest claim, the burden of proving probable cause does not shift to a defendant in a § 1983 claim, see *Rankin* v. *Evans*, 133 F.3d 1425, 1436 (11th Cir.), cert. denied, 525 U.S. 823 (1998) ("plaintiffs had the burden of demonstrating the absence of probable cause in order to succeed in their § 1983 .claim"), nor does it shift in a claim of malicious prosecution. See R.W. Bishop, Prima Facie Case § 39.6, at 602 n.1 (4th ed. 1997), citing *Keefe* v. *Johnson*, 304 Mass. 572, 577 (1939).

civil rights violation if he arrests someone to prevent the exercise of their right to speech under the First Amendment to the United States Constitution. The judge categorized the relevant speech as the plaintiffs' repeated requests for Officer Wolverton's badge number. However, the judge refused to give the instruction, calling the First Amendment theory "remote" and worrying that its inclusion would confuse the issues before the jury.

The judge was correct in refusing to instruct separately on the First Amendment theory. A civil rights violation based on the First Amendment would have been redundant of the plaintiffs' Fourth Amendment claim that the officers arrested them without probable cause. When defining probable cause to the jury, the judge framed the issue as whether the plaintiffs were arrested for their refusal to leave the station, or whether they were arrested as a pretext because the officers did not want the plaintiffs to identify their badge numbers. The jury were instructed that if the arrests were a pretext, there was no probable cause. The jury specifically found that the officers had probable cause to arrest the plaintiffs. This finding would be inconsistent with a determination that the officers arrested the plaintiffs for the purpose of suppressing their First Amendment right to request an officer's badge number. Because the Fourth and First Amendment theories were linked, it was unnecessary for the judge to give a separate instruction on the First Amendment.

7. *Public accommodation law.* The plaintiffs argue that the judge should have instructed the jury that the right to be in a place of public accommodation was a civil right. Massachusetts law defines a public accommodation as "any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public." G. L. c. 272, § 92A. General Laws c. 272, § 98, provides for the liability of a person who "makes any distinction, discrimination or restriction on account of race, color, religious creed, national origin, sex, [or] sexual orientation . . . relative to the admission of any person to, or his treatment in any place of public accommodation." "This right is recognized and declared to be a civil right." *Id.* The judge instructed:

"[I]n order to have a criminal trespass, you must have somebody remaining on the property without a right to do so. The MBTA station is a place of public access and public accommodation, and we all have the right to be there [unless] we do something in violation of the law. And the police officers' position in this case is that once they had told Daniella and Dominique to leave, they based their direction on a fear of the public safety danger [*sic*], and if they had probable — if that public safety concern were genuine; and if the Gutierrez sisters continued to remain in the station thereafter, then they had lost their right to stay there and were committing a trespass."

This instruction accords with our case law, which states that "[a] place of public accommodation . . . has an obligation to treat each member of the public equally, except for good cause." *Smith* v. *Suburban Restaurants, Inc.*, 374 Mass. 528, 530 (1978). The instruction alerted the jury to the fact that the police officers had a right to order the plaintiffs to leave only for good cause. It left the jury free to decide whether to believe the officers' assertion that their fear of a melee in the MBTA station was the motivation behind their order to leave.

The plaintiffs also challenge the judge's refusal to instruct the jury that they could find a separate civil rights violation based on the fact that the defendants ordered the plaintiffs to leave a place of public accommodation. This argument is without merit. The plaintiffs did not present evidence that the defendants sought to exclude them on the basis of race or any other basis prohibited by the public accommodation statute. Thus, the judge did not err by refusing to instruct the jury on a separate civil rights violation based on the public accommodation law.

8. *Emotional distress.*[13] During their deliberations, the jury asked, "Can negligent injury be only emotional injury without physical injury?" The judge instructed the jury that the answer to their question was "no," stating that "there must be an ac-

---

[13]The plaintiffs' complaint alleged claims for intentional infliction of emotional distress, but did not allege claims for negligent infliction of emotional distress. However, the trial judge construed the general negligence claims as pleaded broadly enough to include negligent infliction of emotional distress. The defendants did not object. We assume, for the purposes of argument, that the plaintiffs sufficiently pleaded claims for negligent infliction of emotional distress.

companying physical injury along with any emotional injury."
The plaintiffs argue that this is an incorrect statement of the law
because, in *Sullivan* v. *Boston Gas Co.*, 414 Mass. 129 (1993),
we eliminated the physical injury requirement for negligent
infliction of emotional distress.[14]

Although the *Sullivan* case did reduce the showing required
by a plaintiff to succeed on a claim for negligent infliction of
emotional distress, *Bresnahan* v. *McAuliffe*, 47 Mass. App. Ct.
278, 283-284 (1999), the plaintiffs interpret the case too broadly.
Prior to *Sullivan*, our case law had required that a plaintiff
demonstrate: "(1) negligence; (2) emotional distress; (3) causa-
tion; (4) physical harm manifested by objective symptomatol-
ogy; and (5) that a reasonable person would have suffered
emotional distress under the circumstances of the case." *Sulli-
van* v. *Boston Gas Co.*, supra at 132, quoting *Payton* v. *Abbott
Labs*, 386 Mass. 540, 557 (1982). Under the former rule, the
plaintiffs had to substantiate the objective symptomatology with
"expert medical testimony." *Payton* v. *Abbott Labs*, supra at
556. We then relaxed this requirement, holding instead that
plaintiffs must "corroborate their mental distress claims with
enough objective evidence of harm to convince a judge that
their claims present a sufficient likelihood of genuineness to go
to trial." *Sullivan* v. *Boston Gas Co.*, supra at 137-138. We did
not eliminate the physical harm requirement, but merely
expanded the range of symptoms that may provide the type of
objective evidence to prove physical harm to include symptoms
that could be classified as more "mental" than "physical." *Id.*
at 135-139 ("we hold that both plaintiffs produced sufficient
objective evidence of *physical manifestation* of mental distress
to survive a summary judgment motion" [emphasis supplied]).
In addition, we explicitly stated that "[a] successful negligent
infliction of emotional distress claim . . . must do more than al-
lege 'mere upset, dismay, humiliation, grief and anger.' " *Id.* at
137, quoting *Corso* v. *Merrill*, 119 N.H. 647, 653 (1979).

The plaintiffs argue that Dominique's tears on the stand

---

[14]Daniella prevailed on her negligence claim, and the emotional components
of Daniella's pain and suffering in connection with her broken arm were
compensated under her general claim for negligence. Thus, there is no issue
raised as to Daniella and we address the issue only with respect to Dominique.

provided "objective manifestations" of her emotional distress. Tears clearly are not the type of objective evidence contemplated in the *Sullivan* case, where one of the plaintiffs presented evidence that he suffered from tension headaches, concentration and reading problems, sleeplessness, upset stomach, nightmares and depression. *Id.* at 131. Subsequent cases deemed similar types of symptoms sufficient to provide "objective evidence." See *Kelly* v. *Brigham & Women's Hosp.*, 51 Mass. App. Ct. 297, 306 (2001) (plaintiff alleged symptoms such as depression, cramps, shortness of breath and nightmares); *Bresnahan* v. *McAuliffe, supra* at 282 (plaintiffs alleged symptoms such as uncontrollable crying spells, stomach pain, headaches, loss of concentration, depression, anger, anxiety, loss of sexual relationship and nightmares). Dominique has not alleged any such manifestations of distress. Tears merely demonstrate upset, anger, or grief, and these feelings alone do not constitute sufficient physical manifestation.

9. *Request for admission.* After Officer Cantella testified that Daniella's arm was broken during the incident, the plaintiff sought to introduce the officer's response to a request for admission in which the officer denied the allegation that he had broken her arm. The judge agreed to allow the response in evidence because he believed that it constituted, a prior inconsistent statement. However, the judge indicated that he would also give the following instruction: "Requests for admissions try to pin respondents down and make them answer questions in a very short and direct manner, and sometimes that can be very confining to those people who are answering."

The plaintiffs' counsel objected to the instruction and chose not to introduce in evidence Officer Cantella's response to the request for admission. The plaintiffs argue that the judge's instruction was improper because it would have suggested to the jury that the use of requests for admission is "improper and underhanded."

The judge incorrectly concluded that a denial of a request for admission is admissible as a prior inconsistent statement. The purpose of a request for admission is to narrow the issues for trial by "identifying those issues and facts as to which proof will be necessary." J.W. Smith & H.B. Zobel, Rules Practice

§ 36.1 (1975). A denial of a request for admission is not a statement of fact; it simply indicates that the responding party is not willing to concede the issue and, as a result, the requesting party must prove the fact at trial. *American Communications Telecommunications, Inc.* v. *Commerce N. Bank,* 691 S.W.2d 44, 48 (Tex. Ct. App. 1985) (refusal to admit answers to requests for admission affirmed because denial is "nothing more than a refusal to admit a fact"). Cf. *United States* v. *Operation Rescue Nat'l,* 111 F. Supp. 2d 948, 968 (S.D. Ohio 1999) (Fed. R. Civ. P. 37 (c) is mechanism for addressing refusals to admit request for admission; "a party may not seek a pre-trial determination of the accuracy of an opponent's denial of a request for admission, merely because the evidence does not support that denial"); *Lakehead Pipe Line Co.* v. *American Home Assur. Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997) (same). The sanction for improperly responding to a request for admission is the shifting of the award of incurred expenses. See Mass. R. Civ. P. 36 (a), 365 Mass. 795 (1974).

Further, Mass. R. Civ. P. 36 (b), 365 Mass. 795 (1974), which governs requests for admissions, does not specifically provide for the admission of denials in evidence. Although the rule states that admissions are conclusively binding on the responding party, it makes no parallel provision for the use of a denial. By contrast, Mass. R. Civ. P. 33 (b), 365 Mass. 790 (1974), governing interrogatories, states that the answers to interrogatories "may be used [at trial] to the extent permitted by the rules of evidence." The omission of a similar provision in rule 36 (b) indicates that, although admissions have binding effect, denials do not have such an effect and cannot be introduced in evidence. Although the judge improperly conditioned the admission of the denial on his instruction, the error was harmless, as the plaintiffs declined to introduce the denial.

10. *Peremptory challenges.* The plaintiffs argue that the judge improperly handled their objection to the defense counsel's use of peremptory challenges to strike African-Americans from the jury. According to the plaintiffs, the judge impermissibly supplied a race-neutral justification for the peremptory challenges when the burden is on the defense to do so. Although a peremptory challenge is presumed to be proper, this presumption can

be rebutted by a showing that "(1) there is a pattern of excluding members of a discrete group and (2) it is likely that individuals are being excluded solely on the basis of their membership within this group." *Commonwealth* v. *Garrey*, 436 Mass. 422, 428 (2002), quoting *Commonwealth* v. *Curtiss*, 424 Mass. 78, 80 (1997). When a party claims that the opposing party has impermissibly exercised a peremptory challenge on the basis of race, the judge first determines whether it is likely that the juror has been excluded due to his minority status. *Commonwealth* v. *Garrey, supra* at 428. If so, "the burden shifts to the challenging party to provide a group-neutral reason for the challenge." *Id.*

Although the judge did not make an explicit finding that the plaintiffs had successfully rebutted the presumption, the judge made an implicit finding to this effect when he asked counsel to explain his challenges to three African-American jurors. *Commonwealth* v. *Carleton*, 418 Mass. 773, 774 (1994). The record does not support the plaintiffs' claim that the judge, rather than counsel, supplied the justification for the defense challenges. The defense asserted that it challenged some of the jurors because they had "complaints about work" and had expressed an unwillingness to serve on a jury. The judge then reviewed each of the challenged minority jurors and, after determining that each had expressed reservations about serving relative to their work, upheld the defendants' peremptory challenges. This procedure was not improper.

11. *The plaintiffs' conspiracy claim.* The plaintiffs' complaint alleges that the defendants conspired to deprive them of their civil rights. The judge denied the defendants' motion for directed verdict in its entirety, but refused to instruct the jury on conspiracy. To establish a civil conspiracy, a plaintiff must demonstrate that "a combination of persons [acted] pursuant to an agreement to injure the plaintiff." J.R. Nolan & L.J. Sartorio, Tort Law § 99, at 136 (2d ed. 1989). "It is not sufficient to prove joint tortious acts of two or more persons . . . ." *Id.* at 134. The plaintiffs did not offer evidence that the defendants agreed together to violate the plaintiffs' civil rights. The only evidence that could possibly support a conspiracy theory was the errors in the police reports and evidence that one officer had

copied a section of his police report verbatim from another. This evidence is insufficient to establish an "agreement" among the defendants. The judge's refusal to submit the claim to the jury was not error.

12. *Conclusion.* We affirm the judgment below on the plaintiffs' claims for malicious prosecution, civil rights conspiracy, and civil rights claims based on a lack of probable cause to arrest. We vacate the judgment with respect to the plaintiffs' abuse of process claims, false arrest claims, and Daniella's Federal civil rights claim based on excessive force. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*